UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS

| | | |
|---|---|---|
| MIRROR FINISH PDR, LLC, and | ) | |
| WESLEY ADAM HUFF | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No: 3:20-cv-00440 |
| | ) | |
| COSMETIC CAR COMPANY | ) | |
| HOLDINGS, INC. COSMETIC CAR | ) | |
| COMPANY LLC; | ) | |
| MIDWEST DENT COMPANY; | ) | **JURY TRIAL DEMANDED** |
| AUTO DENTICIAN, INC., | ) | |
| CHARLES DANIEL BINKLEY, | ) | |
| ERIC STOKES and ANDY CLAWSON | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Comes now Defendant, Mirror Finish PDR, LLC, and Wesley Adam Huff, by and through their attorneys Donovan Rose Nester P.C., and for their <u>Second</u> Amended Complaint against Defendants, states as follows:

### ALLEGATIONS APPLICABLE TO ALL COUNTS

### I.   THE PARTIES

1.   Plaintiff, Mirror Finish PDR, LLC ("Mirror Finish") is a Missouri LLC of which Wesley Huff is the sole member.

2.   Plaintiff, Wesley Huff, is an Illinois citizen with his domicile located in Madison County, Illinois.  <u>Wesley Huff is or was a partner in a current or former partnership known as Carmed 45 ("Carmed 45 Partnership").  The current status of the Carmed 45 Partnership is unknown to Plaintiff because that information is in the possession and control of Defendants.</u>

3.      Plaintiff, Mirror Finish was informed that it is or was a current or former member of a Missouri LLC purportedly known as Carmed 45, LLC.  The current status of Carmed 45 LLC is unknown to Plaintiffs because that information is in the possession and control of Defendants.  The Missouri Secretary of State lists Carmed 45, LLC as "active," though on information and belief it ceased operations in or about March 31, 2015.

4.      Defendant, Cosmetic Car Company ("CCC") is an Illinois LLC, with its principal place of business in Roxana, Illinois.

5.      Defendant, Charles Daniel Binkley ("Binkley"), is the founder and sole owner of CCC.

6.      On information and belief, Binkley is the owner of the Tradename and Trademark "Carmedic," collectively hereinafter referred to as the "Tradename."

7.      Hereinafter, "Carmedic" refers to all affiliated entities of which CCC is a partner or member which perform PDR services under the Tradename Carmedic.   Collectively, these affiliated entities, under the management and control of CCC, hold themselves out to the general public as a single business entity doing business as Carmedic.

8.      Defendant Auto Dentician, Inc. ("ADI") is a Utah corporation that is not registered to conduct business in the state of Illinois, but which operates in Illinois in violation of 805 ILCS 180/45-45.

9.      Defendant Andy Clawson is the sole shareholder of ADI.

10.      ADI operates as a PDR provider under the Carmedic Tradename, by and through numerous Carmedic-affiliated entities.

11.      Defendant Midwest Dent Company ("MDC") is a Missouri Corporation that is not registered to conduct business in Illinois, but which operates in Illinois in violation of 805 ILCS 180/45-45.

12. MDC operates as a PDR provider under the Carmedic Tradename, by and through numerous Carmedic-affiliated entities.

13. Eric Stokes is the sole shareholder of MDC.

14. At all times, it was represented to Wesley Huff by Binkley, Eric Stokes and Andy Clawson that CCC, ADI and MDC are or were equal partners in the entity known as the Carmed 45 Partnership.

15. At all times, Binkley, Eric Stokes and Andy Clawson represented to Wesley Huff, as the sole owner of Mirror Finish, that Mirror Finish was an equal Member in Carmed 45, LLC, with equal pro-rata ownership of same, along with CCC, ADI and MDC.


## II.   THE FRAUDULENT CARMEDIC SCHEME

16. The "Carmedic Organization" is a collection of hundreds of loosely affiliated partnerships, LLC's and/or other business entities which operate under the Carmedic Tradename.

17. The common condition of each of these purportedly legally independent entities is: 1) each operates under the Carmedic Trademark; 2) each is in the business of performing a type of auto-body repair known as paintless dent removal ("PDR"); 3) each is unilaterally managed and controlled by CCC, which is solely owned and controlled by Binkley; 4) All of the actual PDR work done by each purportedly independent entity is performed solely by a person that is termed the "Managing Partner," also known as the "downline partner" such as Plaintiff(s) here; 5) the Managing Partner is neither an actual partner, in that he/she has no actual equity in the business with any realizable value, nor does he/she have management control over any aspect of his/her particular Carmedic-affiliated entity.

18. At the center of the Carmedic Organization's scheme, which was created by, and is orchestrated and actively managed by CCC and Binkley, is a pyramid scheme that recruits primarily victims seeking a self-employed business opportunity into the scheme, with the promise of owning,

operating and growing the victim's own business, including the promise of autonomy, wealth and asset growth and future financial security, limited only by the victim's own dedication and hard work.

19.     Carmedic recruits potential "downline partners", in part, by misrepresenting that it has trade secrets including "proprietary tools" and "proprietary trade processes" that are not available to others in the marketplace, and that therefore provide a competitive advantage to the potential "partner" in establishing and building their own business performing PDR work.

20.     A trade secret is something used in a company's business that (a) is not known or readily accessible by competitors, (b) that provides a competitive advantage in the marketplace, and (c) the owner of the information protects from disclosure through reasonable efforts to maintain its secrecy.

21.     In fact, Carmedic has no trade secrets.

22.     Carmedic has no proprietary tools.  All of the tools that Carmedic and its affiliated entities utilize for PDR work are standard tools available to anyone else in the general public to purchase, and are, in fact, purchased by Carmedic and its affiliated entities from regular public retailers.

23.     Carmedic has no proprietary trade practices.  Carmedic trains new recruits in the skill of PDR by sending them to a 3rd party training program that teaches techniques that are readily available to, and regularly taught to, the general public.  There are numerous third-party training providers that teach the exact same techniques, including well known trade schools and community colleges.

24.     Nearly all PDR service providers utilize the same tools and techniques as Carmedic.

25.     Not only, does Carmedic not have any proprietary tools or process regarding PDR, it does not provide the necessary tools or PDR training to new recruits.

26.     Carmedic makes new recruits pay for their own tools and PDR training from third-party providers.

27.     Carmedic's structure is very similar to a typical multi-level marketing pyramid scheme.

28.     Carmedic entices recruits with an opportunity to be their own boss and run their own business, with the additional promise that the product or service they will be selling is unique and will give them a competitive advantage.

29.     Central to the promise of wealth and asset growth is that the recruit has unlimited future growth if they can recruit others into the Carmedic organization, which can then become said recruit's future "downline partners."

30.     After enticing potential new recruits with blatant misrepresentations and false promises, Carmedic recruits are told they must go on a training retreat, out of town and away from their families, to learn about the business prior to being eligible to sign-up to "own" a Carmedic business entity.  Recruits are specifically informed that this is a training retreat related to the Carmedic business opportunity.

31.     This "retreat" is provided by a third-party provider known as "Empower U."

32.     The recruit is required to pay for the Empower U. retreat out of their own pocket.

33.     The Empower U. "retreat" is, in fact, not a business training retreat related to the performance of PDR services or the business of Carmedic.  It is a bootcamp style indoctrination program where potential recruits are bombarded, for 4 days and nights, with cult-like messaging regarding designed and intended to cloud the recruit's judgment and encourage the recruit not to question authority.

34.     The overarching message that is indoctrinated into the recruits regarding Carmedic is to "trust the process" and not "question the system or Carmedic hierarchy."

35.     At the end of the Empower U. program, recruits are transported directly back to Carmedic headquarters, and pressured to immediately sign-up to be "partners" of Carmedic.

36.     They are told they have to make a decision immediately and told not to consult an attorney.

37.     Once recruits become "partners" they are sent to PDR training, which is provided by a third-party, and paid for by the new "partner."

38.     They are then told they have to buy their own tools, as well as uniforms and vehicles bearing the Carmedic logo.

39.     They are then told to go out and "create their own business."

### III.     THE FRAUD OF PURPORTED BUSINESS OWNERSHIP

40.     The Carmedic website actively recruits new "partners" to start their own "small business" and be a part of Carmedic's "partner network."

41.     This is central to the entire marketing strategy of Carmedic directed to potential recruits.

42.     This representation is first made at the marketing and recruitment stage, and continuously and persistently throughout the "partner's'" relationship with the Carmedic organization.

43.     Carmedic "partners" have all of the responsibility of building their purported business; buying their own their tools, supplies, clothes and vehicles, building a customer base and performing literally ALL of the PDR work for said "business."

44.     They do not actually realize any of the benefits of being the owner of the business, primarily, building wealth through the value of the business itself.

45.     Despite the constant and consistent messaging by Carmedic that Carmedic "partners" are actual partners or shareholders who own their own business, they do not have a tangible or intangible ownership interest in any business, in any practical sense.

46.     They cannot transfer their business interest.  They cannot sell it.  They cannot force their supposed partners to buy them out.

47.     They are, in all practical respects, simply employees of CCC, and their other upline partners.

48.     They also, however, receive none of the benefits of employment including, but not limited to, statutorily required workers compensation insurance coverage, the payment of employment taxes by an employer, Family and Medical Leave Act protections, minimum wage protections and protection by applicable labor laws, to name a few.

49.     Carmedic is not a franchisor.  Carmedic partners do not own a Carmedic franchise.

50.     Carmedic is purposely vague about the legal type, degree or mechanism of "ownership" Carmedic "partners" have in the organization and what, if anything, they actually own with regard to their new "business."

51.     Carmedic does not advertise directly to the general public regarding its PDR services.

52.     It does, tellingly, advertise only for more *potential partners* to join the Carmedic organization.  This is a classic trait of multi-level marketing pyramid schemes.  See marketing material of the Carmedic organization attached hereto as Exhibit A.

53.     The marketing pamphlet directed to potential new "partners" opens with the line: "Dear Potential Partner, [h]ave you ever seriously considered working for yourself or wondering what it would take to make that a reality?"  *Id.*

54.     The pamphlet goes on to sell the concept of starting one's own business with Carmedic and repeatedly describes their "business model system of owner partners."  *Id.*

55.     The pamphlet states that "[o]ur business model is based on the development of partnerships, rather than licensing or selling franchises. A franchise model would not provide enough

support or training to guarantee success. Although Carmedic® partnerships require hard work and dedication, they pay off in the end." *Id.* at p. 8.

56.     The pamphlet states that Carmedic has "developed an environment where the drive and ambition of the Entrepreneur can thrive while maintaining the security and added strength of operations that a Partnership provides." *Id.* at p. 10.

57.     The Carmedic organization relies upon its "partners" to market and advertise their own PDR services to potential customers.

58.     The Carmedic organization relies upon its downline partners to do literally all of the PDR work.

59.     The complex and difficult-to-understand multi-layer compensation structure of Carmedic is a hallmark of multi-level marketing pyramid schemes.

60.     Though "partners" are told they own their own business, 100% of the payments for the services they provide go directly from customers to CCC.

61.     CCC is the "Managing Partner" and has unilateral control of each and every Carmedic business entity and the unilateral right to change the terms and conditions of the business arrangement and the policies and procedures of the business at will.

62.     Policies and procedures, down to the minutia, such as dress codes, facial hair restrictions and other personal restrictions such as a ban on visible tattoos, are also strictly enforced unilaterally by CCC against purported "partners."

63.     CCC is the Tax Matters Partner and unilaterally controls and manages all tax issues for each and every Carmedic business entity.

64.     CCC accepts and processes 100% of the revenue generated by the PDR services performed by the "downline partner."

65.     CCC then processes said revenue, and reimburses itself for the "expenses" of processing the revenue.

66.     The "partner" has no authority or discretion regarding how much is paid to CCC to provide this "service."  The partner is then paid approximately fifty-percent of the net income that remains after these purported expenses.

67.     The remainder of the net income, fifty-percent, is paid to the other purported upline partners, (in this case CCC, ADI and MDC) none of whom have performed any work of any kind.

68.     "Upline partners" in every Carmedic business entity (here, CCC, ADI and MDC) take half the net revenue generated solely by the "downline partner," in this case Plaintiff(s).

69.     "Upline partner" is a typical multi-level marketing term for people or entities that receive a share of the revenue generated by "downline partners" (such as Plaintiff(s)) that they have recruited for the ultimate benefit of pinnacle upline entity (here, CCC).

70.     Upline partners in each Carmedic business entity are paid this revenue stream, potentially in perpetuity, as a reward for recruiting the downline partner and to encourage the recruitment of more downline partners.

71.     Downline partners are, in turn, encouraged to create new Carmedic business entities in other territories by recruiting new "downline partners" of their own, so that they can become "upline partners" and get paid a percentage of the new "downline partner's" revenue.

72.      For each new Carmedic business entity created by a newly recruited "downline partner" CCC is the pinnacle "upline partner."  It is always the managing member with unilateral control over each entity.  It always gets paid to "process payments" and perform other administrative services and it always gets a large percentage of any revenue created on the back-end.

73.     When the downline partner, such as Plaintiff(s), dies, withdraws, becomes injured such that he/she can't perform PDR anymore, or wishes to retire, he does not get paid the value of the business he has been repeatedly told that he owns.

74.     He is told that he is not entitled to a distribution of his share of the market value of the "business" he has been led to believe he was building from the ground up.

75.     He is informed that his "ownership interest" in his "partnership" has no value once he stops performing PDR work and generating revenue for upline partners.

76.     The upline partners then take the customer base that the "downline partner" has created and cultivated, and the revenue stream created thereby, and divide and redistribute it among themselves, like the spoils of war, by giving those customers to other Carmedic entities in which they have an ownership interest, essentially gutting the "business" the "downline partner" was defrauded into believing he was building.

77.     In essence, downline partners are, in almost every respect, simply a commission-based employee, without any of the benefits of employment.

78.     When they stop working to earn money for their upline partners, they stop getting paid.

79.     The entire arrangement is a fraud designed specifically to induce victims to dedicate their lives to building a "business" from which they will never derive an actual ownership benefit.

**IV.      ADITIONAL ALLEGATIONS SPECIFIC TO PLAINTIFFS**

80.     Each of the allegations of paragraphs 16 through 79 set forth herein accurately describe the experience of Plaintiff(s) with regard to his relationship with the Carmedic organization, CCC, Dan Binkley and his "upline partners" ADI, MDC, Eric Stokes and Andy Clausen.

81.     Wesley Huff was recruited by agents of CCC and Carmedic, Troy Bingham and Mike Mortensen, in the spring of 2009, with the promises described above of business ownership, endless

opportunity to build and grow a business, autonomy, self-direction, being his own boss and (most importantly) wealth and asset creation resulting from same.

82.    In December of 2009, Plaintiff interviewed with Dan Binkley.  In this interview, Dan repeatedly stated that becoming a Carmedic "partner" meant "being your own boss."

83.    He represented to Plaintiff that if he chose to join the Carmedic organization he would "own and run your own business."

84.    He represented that the "business would be yours."

85.    He represented that Carmedic had a competitive advantage in its trade secrets in that it had "proprietary tools" and "proprietary dent removal processes" and that Plaintiff would correspondingly have a competitive advantage in "growing his own business."

86.    He represented that Plaintiff would be "in charge of the day-to-day operation of the business."

87.    He represented that he "would build wealth and equity by building his own business and that he could hand the value of the business down to his children."

88.    He represented that Plaintiff would "own the value of the business he creates, and that there was no ceiling to the value of the business he could build."

89.    These representations began by Dan Binkley at the interview in December 2009, and continued, ceaselessly, until Plaintiffs constructive termination on March 31, 2015.

90.    Upon Plaintiff's return was Empower U., in approximately the first week of January 2010, he was advised to return immediately Carmedic headquarters.

91.    He was told not to have contact with his family before returning to Carmedic headquarters.

92.    He was greeted by Dan Binkley who once against informed him that he would be a "business owner" if he signed up to be a Carmedic "partner."

93.     Dan Binkley represented to Plaintiff that if he became a Carmedic "partner" he would be able to "provide for your family and build wealth for your family by building a family business."

94.     Dan Binkley presented Plaintiff with documents to sign and advised him that if he wanted to take more time in order to have an attorney review the documents then Plaintiff would not be able to become a Carmedic "partner."

95.     At said time, Plaintiff had already invested twelve thousand dollars in this venture and could not afford to lose the opportunity he believed he was being presented.

96.     Plaintiff agreed to become a Carmedic "Partner."

97.     Subsequently, Plaintiff began training, which was provided by a third-party at the Carmedic headquarters and which Plaintiff had to pay for.

98.     These same misrepresentations, that Plaintiff would "own his own business," that he would "operate his own business," that he would build wealth by building his own business," were made by both Eric Stokes and Andy Clausen repeatedly, and consistently, during Plaintiff's training which began in January of 2010 and lasted for eight weeks.

99.     Eric Stokes and Andy Clausen repeatedly told him during training that "the only limit on building the value of your business is your own determination and willingness to work hard."

100.    The representation that Plaintiff would be a "partner" and "own and operate his own business" was made countless times to Plaintiff, repeatedly, over a period of years, by Dan Binkley, Eric Stokes, Andy Clausen and numerous other agents of CCC and the Carmedic organization.  It is the central misrepresentation and the central motivator to encourage "downline partners" to generate profits for "upline partners" and ultimately CCC.

101.    It is the mantra of the Carmedic organization.  It is an outright misrepresentation and specifically designed to induce potential partners to become partners, and dedicate their working life to Carmedic in order to generate profits for Defendants.

102.     It is specifically designed and intended to continue to induce "downline partners" to dedicate their working life to Carmedic and to work hard to build the business and generate revenue for the upline partners and CCC and, ultimately, Dan Binkley.

103.     Plaintiff(s) relied on these misrepresentations.

104.     These misrepresentations were effective.  Plaintiff, at all times, believed that he owned a tangible ownership interest in his Carmedic "partnership" until after he was constructively terminated and was informed that it had no value.

105.     On March 31, 2015, Plaintiff informed Defendants that he wished to disassociate with the Carmedic Organization.

106.     He inquired repeatedly regarding how he would receive the value of the business be had created over a period of six years.

107.     He was informed, by Dan Binkley, Eric Stokes and Andy Clausen, in no uncertain terms, that he owned nothing.

108.     He was informed, by Dan Binkley, Eric Stokes and Andy Clausen, in no uncertain terms, that he owned nothing and would receive nothing.

109.     Misrepresentations regarding business ownership and long-term asset and wealth building were also made consistently and repeatedly in emails and texts.

110.     When Plaintiff was constructively terminated from his Carmedic "partnership," his access to his own business emails and texts was blocked by CCC.

111.     Misrepresentations regarding business ownership and long-term asset and wealth building were also made consistently and repeatedly in phone conferences that were recorded by Carmedic and CCC.

112.    Misrepresentations regarding business ownership and long-term asset and wealth building were also made consistently and repeatedly in additionally company materials such as meeting minutes, team building events and marketing materials directed to potential partners.

113.    Plaintiff repeatedly requested, and was repeatedly denied, access to his own email and text communications regarding the business he was told that he "owned."

114.    Plaintiff states that these email and text records would show numerous additional examples of specific misrepresentations regarding business "ownership" and "building wealth and equity" designed to induce and encourage continued loyalty to the Carmedic organization.

115.    Plaintiff has requested the entire files of Carmed 45 Partnership and Carmed 45 LLC.

116.    Defendants have refused to provide same despite Plaintiff being entitled to access to same as a current or former partner or member of same.

117.    The perpetrators of the fraud are in possession of evidence of the fraud and are concealing it.

118.    Plaintiff is 37 years old.

119.    Plaintiff wasted the prime of his working life investing his time, money and energy in building a business that was a lie.

120.    He has nothing to show for his efforts.

121.    He has been deprived of the fruits of his labor by fraud.

122.    He has been deprived of his share of the value of the business he was fraudulently induced to create.

123.    At all times, Defendants knew that they would ultimately divide up the customers of Plaintiffs' business and refuse to acknowledge that Plaintiffs' share of his purported "partnership" had any value and refuse to compensate him for same.

124.    He has been deprived of the opportunity cost of pursuing other endeavors because of the fraudulent scheme perpetrated by Defendants.

## V.    MISCELLANEOUS ALLEGATIONS

125.    The structure and operation of both the Carmed 45 Partnership and Carmed 45, LLC, was in violation of numerous state and federal laws

126.    The Operating Agreement for Carmed 45, LLC, is null and void for being in violation of state and federal law.

127.    Numerous other LLC's were subsequently formed, each of which had CCC as the Managing Member, and over each of which CCC maintained complete unilateral control.

128.    Defendants also misrepresented to Mirror Finish that it had a valuable ownership interest in entities known as CM49, LLC, CM55, LLC, and CM53, LLC in the same manner as set forth in the allegations above.

129.    Plaintiffs, Defendants and all other entities referenced herein are involved in the business of paintless dent removal.

130.    Paintless dent removal is an automotive body repair technique that, put simply, involves popping dents out of car bodies in such a way as they do not require paint to repair.

131.    Paintless dent removal is a common and well know process that is taught by numerous third party training entities that provide training to anyone that wishes to receive it.

132.    While it operated, Carmed 45 LLC provided paintless dent repair services to known, ascertainable customers including car dealership and automotive body shops in St. Clair County, Illinois.

133.    The LLC provided these paintless dent removal services solely by and through Mirror Finish LLC in a mobile format, traveling to customers' locations to perform paintless dent removal

services on-site.  Carmed 45 LLC did not have a brick and mortar location where it provided services for regular consumers.

134.    Mirror Finish, LLC, was constructively forced by Defendants to resign its membership in Carmed 45, LLC on March 31, 2015.

135.    Subsequent to the constructive resignation of Mirror Finish, and the cessation of operations of Carmed 45 LLC, the Defendants conspired to pillage the customers of Carmed 45, LLC, and provide paintless dent repair services within the alleged Operations Area by and through other LLC's in which they have/had an ownership interest.

136.    Defendants conspired to self-deal and deplete all entities in which Plaintiffs had an ownership interest of value to deprive Plaintiffs of their interest.

137.    Defendants conspired to embezzle the assets and customers of all entities in which Plaintiffs had an ownership interest of value to deprive Plaintiffs of their interest.

138.    <u>Defendant's actions in appropriating and dividing and distributing said customers to other entities was for the dual purpose of self-dealing and to render retroactively "true" the representation to Plaintiff that his business had no value and that he was therefore entitled to nothing.</u>

139.    At all times, Defendants perpetrated a fraud upon Plaintiffs in that they conspired to misrepresent the nature and value of Plaintiffs ownership interest in the CCC-related entities as set forth previously herein.

140.    At all times, Defendants perpetrated a fraud upon Plaintiffs in that they conspired to deprive Plaintiffs of the ownership interest and rightful income and benefits from said entities by misrepresenting the very nature of Plaintiffs' interest in said entities.

141.    Defendants fraudulently induced Plaintiffs to enter into the above-referenced business relationship, under knowingly false pretenses, for the purpose of exploiting Wesley Huff for his labor, depriving him of the fruits of said labor and misappropriating his assets.

142.    Defendants engaged in a common scheme to defraud and deprive Plaintiffs.

143.    Plaintiffs received zero value for their ownership interest in any of the CCC-related entities, including their initial investment.

144.    Defendants have profited off their fraud to Plaintiffs' detriment <u>as set forth above herein.</u>

145.    Plaintiffs have been damaged as a result of Defendants' bad acts.

146.    Wesley Huff and Mirror Finish did not, and could not have, discovered Defendants fraudulent acts and representations until subsequent to March 31, 2015.

### <u>COUNT I</u>
**Unjust Enrichment**

Now Comes Plaintiffs, by and through their undersigned counsel, and for Count I of their Complaint, state as follows:

147.    Plaintiffs re-allege and re-assert paragraphs 1 – 146 of their Complaint as if fully set forth herein.

148.    Plaintiffs have realized zero value from the entire business arrangement with Defendants.

149.    Defendants have been unjustly enriched to Plaintiffs' detriment.

150.    Defendants' unjust enrichment is directly related to, and equal to, Plaintiffs' detriment.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant in an amount in excess of $50,000.00 and for such other relief as this Court deems just and proper.

## COUNT II
**Fraud**

Now Comes Plaintiffs, by and through their undersigned counsel, and for Count II of their Complaint, state as follows:

151.    Plaintiffs re-allege and re-assert paragraphs 1 – 146 of their Complaint as if fully set forth herein.

152.    Defendants made false statements of material fact as set forth fully herein.

153.    Defendants knew that their statements were false and/or designed to be misunderstood or misinterpreted.

154.    Defendants intended to deceive Plaintiffs.

155.    Plaintiffs relied on Defendants' false statements.

156.    Plaintiffs were damaged as a result of their reliance on Defendants' false statements.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant in an amount in excess of $50,000.00 and for such other relief as this Court deems just and proper.

## COUNT III
**Breach of Fiduciary Duty**

Now Comes Plaintiffs, by and through their undersigned counsel, and for Count III of their Complaint, state as follows:

157.    Plaintiffs re-allege and re-assert paragraphs 1 – 146 of their Complaint as if fully set forth herein.

158.    At all times Defendants owed Plaintiffs a fiduciary duty.

159.    Defendants breached their fiduciary duty.

160.    Defendants breach of fiduciary duty proximately caused Plaintiffs' damages

161.    Plaintiffs were damaged.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant in an amount in excess of $50,000.00 and for such other relief as this Court deems just and proper.

## COUNT IV
### Fraudulent Inducement

Now Comes Plaintiffs, by and through their undersigned counsel, and for Count IV of their Complaint, state as follows:

162. Plaintiffs re-allege and re-assert paragraphs 1 – 146 of their Complaint as if fully set forth herein.

163. Defendants made false statements of material fact as set forth fully herein.

164. Defendants knew that their statements were false and/or designed to be misunderstood or misinterpreted.

165. Defendants intended to deceive and induce Plaintiffs to enter into the business arrangements described herein.

166. Plaintiffs relied on Defendants' false statements.

167. Plaintiffs were damaged as a result of their reliance on Defendants' false statements.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant in an amount in excess of $50,000.00 and for such other relief as this Court deems just and proper.

## COUNT V
### Civil Conspiracy

Now Comes Plaintiffs, by and through their undersigned counsel, and for Count V of their Complaint, state as follows:

168.     Plaintiffs re-allege and re-assert paragraphs 1 – 146 of their Complaint as if fully set forth herein.

169.     Defendants engaged in a common scheme to deceive and defraud Plaintiffs and deprive them of what was rightfully theirs.

170.     Defendants conspired to commit the tort of fraud as set forth herein.

171.     Defendants agreed to engage in said scheme.

172.     Said scheme had an unlawful purpose or was orchestrated to commit a lawful purpose by unlawful means.

173.     Plaintiffs were damaged as a result of their reliance on Defendants' false statements.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment against Defendant in an amount in excess of $50,000.00 and for such other relief as this Court deems just and proper.

BY   /s Sean K. Cronin
     SEAN K. CRONIN, #60375
     Donovan Rose Nester, P.C.
     15 N. Illinois Street
     Belleville, Illinois  62220
     *scronin@drnpc.com*
     Phone: (618) 212-6500
     Fax (618) 212-6501
     **ATTORNEY FOR MIRROR FINISH PDR, LLC AND WESLEY ADAM HUFF**

## **PROOF OF SERVICE**

I hereby certify that on February 5, 2020, I electronically filed Plaintiffs' Second Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record:

Matthew J. Landwehr
Shaun C. Broeker
One US Bank Plaza
St. Louis, Missouri 63101
mlandwehr@thompsoncoburn.com
sbroeker@thompsoncoburn.com

**Attorneys for Defendants Cosmetic**
**Car Company Holdings. Inc., Cosmetic**
**Car Company, LLC, Midwest Dent**
**Company, Auto Dentician, Inc.,**
**Charles Daniel Binkley, Eric Stokes,**
**and Andy Clawson**

/s/ *Sean K. Cronin*